IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID A. CASEBEER,

        Plaintiff,                  No. CIV S-07-2374 GGH

    vs.

MICHAEL J. ASTRUE,               <u>ORDER</u>
Commissioner of
Social Security,

        Defendant.
                                   /

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is GRANTED IN PART, the Commissioner's Cross Motion for Summary Judgment is DENIED in part, and this matter is remanded to the ALJ for further findings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

<u>BACKGROUND</u>

        Plaintiff, born June 23, 1955, applied on July 27, 2004 for disability benefits. (Tr. at 71.) Plaintiff alleged he was unable to work due to back and hip pain. (Tr. at 112-13.)

\\\\\

1

1    In a decision dated March 29, 2007, ALJ Jean Kingrey determined plaintiff was
2    not disabled. The ALJ made the following findings:[1]

3    1.   The claimant meets the insured status requirements of the
          Social Security Act through December 31, 2008.

     2.   The claimant has not engaged in substantial gainful activity
          since January 16, 2004, the alleged onset date (20 CFR
          404.1520(b) and 404.1571 *et seq*.).

     3.   The claimant has the following severe impairment:
          degenerative changes in the back without evidence for
          neurological compromise and unclear etiology for reported
          pain (20 CFR 404.1520(c)).

     4.   The claimant does not have an impairment or combination
          of impairments that meets or medically equals one of the
          listed impairments in 20 CFR Part 404, Subpart P,
          Appendix 1 (20 CFR 404.1520(d), 404.1525 and
          404.1526).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:
   Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
   Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
   Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
   Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
   Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
   The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

|   |   |   |
|---|---|---|
| 1 | 5. | After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift up to 20 pounds occasionally, and lift up to 10 pounds frequently. He can sit for six hours out of an eight-hour workday, and stand/walk for six hours out of an eight-hour workday. The claimant requires the freedom to change position at least every hour for a brief period of time to relieve discomfort. He has no other functional limitations. |
| | 6. | The claimant is capable of performing past relevant work as a pharmaceutical sales representative, and as a yellow pages advertising sales representative. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565). |
| | 7. | The claimant has not been under a disability, as defined in the Social Security Act, from January 16, 2004, through the date of this decision (20 CFR 404.1520(f)). |

(Tr. at 18-24.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Improperly Rejected the Opinions of Plaintiff's Treating and Examining Physicians; B. Whether the ALJ Erred in Failing to Re-contact Dr. O'Sullivan to Seek Additional Evidence or Clarification Regarding Conflicts or Ambiguities; C. Whether the ALJ Improperly Substituted Her Own Opinion For That of Plaintiff's Doctors, and Made Her Own Independent Medical Findings; D. Whether the ALJ Improperly Rejected Plaintiff's Pain Testimony; and E. Whether the ALJ Relied on an Incomplete Hypothetical to the Vocational Expert, and Improperly Disregarded a Portion of the Expert's Testimony.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

ANALYSIS

    A. Credibility Analysis Was Proper

Plaintiff contends that the ALJ rejected his credibility without a substantial basis.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 547 F.3d 1101 (9th Cir. 2008); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to

follow a prescribed course of treatment; and (3) daily activities.[2]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom."  Vasquez, 547 F.3d at 1104, *quoting* Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007, Smolen, 80 F.3d at 1282.  Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing, and supported by reference to specific facts in the record.  Vasquez, 547 F.3d at 1104-05.

   Plaintiff's credibility was properly questioned for the reasons pointed out by the ALJ.  She first noted that plaintiff claimed his disability began in January, 2004 when he collapsed in a park.  Although he claimed that Dr. Fritzke, a chiropractor, came to his house for treatment at this time, there is no medical record of treatment after this incident until July, 2004, when plaintiff saw Dr. Fritzke for chiropractic care.  His first visit to a medical doctor after his collapse was in May, 2005, when he saw Dr. O'Sullivan.  Coincidentally, the ALJ noted that plaintiff's job as a pharmaceutical representative ended after he moved to a dream house in Mt. Shasta in September, 2003, and apparently wanted to telecommute.  His employer was not agreeable to this arrangement, and his job ended.  (Tr. at 20-21.)  Plaintiff did not leave this job

---

[2] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability.  One does not need to be utterly incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

5

due to inability to work as a result of an impairment.

The ALJ also remarked on plaintiff's refusal to follow treatment in light of his complaints of excruciating pain 24 hours a day. Despite this level of pain, plaintiff took aspirin one to two times per day, and refused prescription drugs as they might damage his liver or were otherwise unsafe. The ALJ noted that plaintiff nevertheless drank beer every day. (Id. at 22.) Plaintiff was also leery of following Dr. O'Sullivan's advice to get facet blocks, epidurals, or additional studies, because he thought it was "economically irresponsible" to do so. The aforementioned reasons are clear and convincing and supported by the record.

Plaintiff contends in part that he did not obtain further treatment due to his lack of insurance. Any argument that plaintiff was not taking medication because he could not afford it is inapposite. Social Security Ruling 82-59[3] "only appl[ies] to claimants who would otherwise

---

[3] SSR 82-59 provides in relevant part (emphasis added):

Individuals with a disabling impairment which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, <u>unless there is a justifiable cause for the failure to follow such treatment</u> ...

The underlying regulation, 20 C.F.R. § 416.930 (and companion regulation 20 C.F.R. § 404.1530 under Title II) similarly provides:

(b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled ...

Both 20 C.F.R. § 416.930 and SSR 82-59 identify specific acceptable reasons for declining to following prescribed treatment, none of which are present here.

20 C.F.R. § 416.930(c) sets forth the following examples of acceptable reasons for declining to following prescribed treatment:

(1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
(2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
(4) The treatment because of the enormity (e.g. open heart surgery),

6

be disabled within the meaning of the Act." Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995). The ALJ made a specific finding that plaintiff was not disabled without regard to his failure to seek treatment.[4]

Plaintiff's assertion that he was concerned about adverse side effects of prescription medications is not an established reason to forego treatment. SSR 82-59. Plaintiff's claim that Dr. O'Sullivan never actually prescribed treatment is not true. Dr. O'Sullivan's May 18, 2005 report specifically provides all of his recommendations for further treatment which were discussed with plaintiff, but states that plaintiff was hesitant to proceed due to expense:

> Further work-up could be considered including MRI studies of both the lumbar and cervical spine. I am concerned about his hip joint being a source of pain. Further work-up and evaluation by a pain management specialist could be helpful, including precision injections in his back with either facet blocks or epidurals, and possibly SI joint blocks and even hip injections. We discussed all of these options with him. Currently he is under-the-gun because he does not have insurance and is a bit leery about proceeding with expensive investigations and work-up.

(Tr. at 188.)

Plaintiff further contends that he must only follow prescribed treatment if it can restore his ability to work, and here there has been no prescribed treatment that has been shown capable of restoring his ability to work. The underlying regulation, 20 C.F.R. § 404.930(a)

---

unusual nature (e.g. organ transplant), or other reason is very risky for you; or
(5) The treatment involves amputation of an extremity, or a major part of an extremity.

Additional acceptable reasons for declining to following prescribed treatment set forth in SSR 82-59 are:

(1) Fear of surgery;
(2) Inability to pay for prescribed treatment;
(3) A medical source has advised against the treatment.

[4] Moreover, based on the present record, it is speculative to determine that plaintiff was precluded from further treatment because of economic impossibilities. One is not necessarily forgiven from seeking further treatment simply because one prioritizes other economic needs ahead of medical care.

7

provides that in order to receive benefits, prescribed treatment must be followed "if this treatment can restore your ability to work."

20 C.F.R. § 404.1530 provides:

> *(b) When you do not follow prescribed treatment.* If you do not follow the prescribed treatment without a good reason, we will not find you disabled ...

Under such circumstances, the Ninth Circuit has outlined several factors for consideration in determining whether a claimant's failure to follow treatment is justifiable. Nichols v. Califano, 556 F.2d 931 (9th Cir. 1977) (interpreting prior 20 C.F.R. § 404.1507, predecessor to the regulation here at issue). The court should consider the physician's opinion on the likely success of the treatment; the type of relationship between the physician and plaintiff (i.e., if a trusted family doctor recommends against the proposed treatment, the plaintiff's decision not to undergo it may be more reasonable); how dangerous or painful the treatment might be; the severity of the ailment; and the plaintiff's age, background, and medical history.

Taking these factors into consideration, it appears that both plaintiff's trusted treating physician, Dr. O'Sullivan, and consulting physician, Dr. Riger, have recommended further treatment. Dr. O'Sullivan opined that further work-up and evaluation could be helpful. (Tr. at 188.) His recommended plan was expressly stated to be conservative, and therefore not dangerous. (Id.) It is unknown how severe plaintiff's ailment is; however, the fact that Dr. O'Sullivan recommended a conservative course rather than surgery probably indicates his condition could benefit from this course, and that it is not necessarily severe. Plaintiff was born in 1955 and is about 53 years old, indicating that he has many years to benefit from the results of the proposed treatment, and is young enough to withstand any adverse effects of the treatment which might debilitate an older person. Conversely to plaintiff's claim that there is no evidence that treatment could restore plaintiff's ability to work, there is no legal requirement that such a standard be met *before* one obtains treatment as this would be a near impossibility. It is well established, however, that many people recover from back and hip pain through conservative

treatment such as steroid injections with physical therapy. See www.spineuniverse.com/displayarticle.php/article2689.html. What is clear is that if plaintiff does not receive treatment, his physical condition most likely will not improve.

In his reply, plaintiff contends that Dr. O'Sullivan found that plaintiff was credible, and specifically opined that plaintiff was not a malingerer, citing to Exs. 9F/1, 11F/2-5, and 12F/8. The court has reviewed these pages and could not locate these statements. Plaintiff's contention that Dr. O'Sullivan believed plaintiff to be credible is implicit, however, in his repeated statements that plaintiff was a candidate for disability.[5]

As plaintiff's arguments are unpersuasive, this court finds that the ALJ's reasons to discount his credibility are supported by substantial evidence.

B. <u>The ALJ Improperly Substituted Her Own Opinion for Those of the Medical Doctors and Made Improper Independent Medical Findings</u>

Plaintiff claims that the ALJ erred in substituting her own medical opinion in place of the medical sources of record. The court finds after reviewing the record that the ALJ erred in this regard.[6]

The ALJ may rely, in part, on his or her own observations, see <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. <u>Marcia v. Sullivan</u>, 900 F.2d 172, 177, n.6 (9th Cir. 1990). The ALJ may not substitute her own layperson opinion for that of trained medical physicians. See <u>Gonzalez Perez v. Secretary of Health and Human Services</u>, 812 F.2d 747, 749 (1st Cir.1987); <u>McBrayer v. Secretary of Health and Human Services</u>, 712 F.2d 795, 799 (2nd Cir.1983); <u>Gober v. Mathews</u>, 574 F.2d 772, 777

---

[5] In the RFC questionnaire dated July 4, 2006, Dr. O'Sullivan checked "yes" to the question of whether plaintiff's impairments were reasonably consistent with his symptoms and functional limitations. (Tr. at 203.)

[6] Although plaintiff raises five "assignments of error," he separately sets out analysis for only two of the issues raised, and this issue is not separately analyzed but referenced within the briefing of the other issues.

9

(3rd Cir.1978); Ferguson v. Schweiker, 765 F.2d 31, 37 (3rd Cir. 1985) (ALJ may not "set his own expertise against that of a physician who presents competent evidence"). It is not sufficient to state that the medical opinions are unsupported by sufficient objective findings or that they are contrary to preponderant conclusions. Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ "must not succumb to the temptation to play doctor and make her own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). The ALJ's RFC finding must be supported by medical evidence. Banks v. Barnhart, 434 F.Supp.2d 800, 805 (C.D. Cal. 2006). "Without a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993).

Here, the ALJ found that plaintiff could lift 20 pounds occasionally and ten pounds frequently, sit for six hours in a work day, stand/walk for six hours, and needed to change position every hour to relieve discomfort. (Tr. at 21.) She came to the conclusion that plaintiff could do his past work which was either light or medium in nature, based on a variety of factors, most notably the lack of objective findings to support his claims which were not credible, and refusal to seek treatment.

It is unknown how the ALJ could have arrived at the aforementioned residual functional capacity as no medical opinion provided such an assessment, and without which it is impossible for the ALJ to assess. All three examining physicians found plaintiff either disabled or in need of further evaluation, and the only contrary opinion in the record is an RFC given by the DDS which was not mentioned at all by the ALJ in her opinion. Furthermore, it was provided by a non-examining source and therefore carries little weight. (Tr. at 144.)

In finding that plaintiff could work as a pharmaceutical sales representative or yellow pages advertising sales representative, the ALJ ignored all of the medical evidence of record, and substituted her own judgment regarding plaintiff's residual functional capacity.

The ALJ improperly discounted the opinions of plaintiff's treating sources, Drs. O'Sullivan and Fritzke, as well as the SSA consultant, Dr. Riger. She found that none of these

10

opinions were backed by objective evidence, and their opinions were based primarily on plaintiff's subjective complaints, which she found to be "quite histrionic at the hearing." (Id. at 23.) She noted for example that Dr. Fritzke found plaintiff disabled after only two visits. (Id. at 22.)

It was error for the ALJ to reject these three medical sources based on the lack of objective evidence as all three doctors conducted objective tests during their examinations, and Dr. O'Sullivan ordered x-rays upon which he based (in part) his determination. Such reasons are not legitimate.[7] Although plaintiff certainly had credibility problems, these doctors did not base their determinations solely on plaintiff's subjective complaints.

The ALJ, although mentioning plaintiff's x-rays, presumably did not consider them as objective evidence supporting the physicians' opinions. On May 18, 2005, an x-ray of the lumbar spine indicated that the fifth vertebra was partially sacralized. There was foraminal stenosis at L5-S1 and L4-5. There was loss of disc height at L4-5 and degenerative changes. An x-ray of the pelvis on this date indicates "some asymmetry of the femoral head with some loss of joint space superolaterally." (Tr. at 189.) In this regard, the ALJ remarked only that these objective studies "did not reveal any pathology that would be expected to produce pain to the extent alleged by the claimant." (Id. at 21.)

The first record of plaintiff's treatment by Dr. Fritzke, a chiropractor, is dated July 21, 2004. (Id. at 160.) On August 13, 2004, plaintiff reported that his back symptoms began when he pulled a duffle bag over his right shoulder with a twisting motion in 1970. (Id. at 158.) Dr. Fritzke conducted an exam based on plaintiff's complaints of pain at 10 on a one to ten scale. Plaintiff experienced pain with every test conducted at this time. Diagnosis was disorder of the

---

[7] To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995). In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Id. at 830.

11

sacroiliac joint and lumbar pain, cervicocranial syndrome, cervicalgia, headache, cervicobrachial syndrome, and brachial neuritis. (Tr. at 159.) Dr. Fritzke conceded that although he had treated plaintiff only twice, he found plaintiff disabled at that time. He precluded plaintiff from lifting 25 pounds or more, and from repeated twisting, pulling, pushing, squatting, and bending. He did not give a prognosis as he did not know how plaintiff would respond to long term care. (Id.)

Dr. O'Sullivan, plaintiff's treating physician, also found plaintiff disabled. (Id. at 184.) He began treating plaintiff in May, 2005, but then not again until September, 2005. (Id. at 184-89.) On May 18, 2005, Dr. O'Sullivan diagnosed "mechanical axial low back pain with degenerative disc disease of the lumbar spine. No evidence of significant neurological compromise by clinical examination." There was also early degenerative arthritis of the right hip and right SI joint dysfunction, neck pain with potential degenerative disc disease, depression, cardiac murmur, ulcers and asthma. (Id. at 187.) Exam revealed restricted range of motion in the cervical spine, loss of lumbar lordosis, minimal local tenderness, tenderness over the right greater trochanter, restricted range of motion of the lumbosacral spine, and restricted range of motion of the right hip. (Id.) Dr. O'Sullivan stated that the source of plaintiff's pain was not totally clear. There was no obvious evidence of neurological compromise. He advised conservative treatment options such as a posture strengthening/stabilization program, further work-up in the form of an MRI of the lumbar and cervical spine, evaluation by a pain management specialist, facet blocks or epidurals, possible SI joint blocks, and hip injections. At this point it was noted that plaintiff was leery because he had no insurance and these recommendations were expensive. (Id. at 188.)

On September 14, 2005, plaintiff reported to Dr. O'Sullivan that he was applying for Social Security Disability, and this physician agreed that he was a candidate for disability. His diagnoses remained the same as the previous visit. He thought plaintiff should see a pain specialist and possibly a hip specialist. (Tr. at 184.)

On July 4, 2006, Dr. O'Sullivan completed a residual functional capacity questionnaire, noting the previous diagnoses, and that plaintiff's prognosis was poor and

expected to last at least a year. (Id. at 202-03.) He opined that plaintiff could walk one block without severe pain or having to rest, and could sit either for 15 to 20 minutes, or one hour, or one hour and 20 minutes, at one time.[8] (Id. at 203.) Plaintiff could stand for 15 to 20 minutes or one hour, but could only sit and stand/walk for a total of less than two hours in a work day. Plaintiff would need to walk around every 20 to 30 minutes for 5-6 minutes at a time. Plaintiff would have to work at a job that permitted shifting positions at will, and unscheduled breaks during the day, for "hours" at a time. Plaintiff would need to use an assistive device with occasional standing and walking. Plaintiff could occasionally lift less than ten pounds and never lift more than that. (Id. at 204.) He could never twist, stoop, crouch/squat, climb ladders, or climb stairs. Plaintiff would probably miss more than four days per month of work due to his impairment. (Id. at 205.)

Dr. Sullivan reported on plaintiff's condition as of May 9, 2007, and his letter was submitted to the Appeals Council. He stated that plaintiff's pain continued to be severe, rated as an eight on a scale of one to ten. Although Dr. O'Sullivan once again discussed getting an MRI, and using medications and steroid injections, plaintiff stated he was financially strapped and apprehensive about taking medications. Exam indicated that plaintiff appeared to be in distress and was tearful. Station and gait were awkward. Plaintiff had difficulty walking on heels and toes. Range of motion of the neck and lumbar spine were restricted. Straight leg raising was limited. There was loss of lumbar lordosis, mild and local tenderness. Range of motion of the hips, shoulders, elbows, wrists, knees and ankles was good. (Tr. at 228.) Diagnosis was "disabling mechanical low back pain with degenerative disc disease of the lumbar spine, right hip degenerative arthritis, and SI joint dysfunction." (Id. at 228-29.) Dr. O'Sullivan concluded that plaintiff's pain and restrictions had continued since his earlier reports, and that plaintiff was a candidate for Social Security Disability. (Id. at 229.)

---

[8] The form asks how many hours/minutes the patient can sit at one time before needing to get up. Dr. O'Sullivan circled both 15-20 minutes and 1 hour. (Id.)

Dr. Riger was the third and final physician to examine plaintiff as part of a consultation request.[9] He thought plaintiff could do less than a full range of sedentary work, and that further evaluation was necessary. On October 12, 2004, he noted a limited range of motion of the neck at 50%, full range of motion of the shoulders, back flexion of 45 degrees, extension of 10 degrees, bending of 10 degrees in each direction. He concluded that plaintiff had "severe intractable back pain, aggravated by most activities. He clearly needs further evaluation for this." (Id. at 137.) At this time, Dr. Riger completed a form regarding plaintiff's functional abilities, finding that plaintiff could lift less than ten pounds occasionally and frequently, stand and/or walk less than two hours in a work day, sit for a total of only two to three hours in work day, and needed to change position frequently. Plaintiff could occasionally balance, but could never climb, stoop, kneel, crouch, or crawl. Plaintiff was also limited in reaching. Dr. Riger concluded that plaintiff's prognosis was poor without further evaluation and treatment. (Id. at 138-39.)

While it is not dispositive to the outcome that a physician makes the ultimate conclusion of disability, and an ALJ is not bound by this ultimate conclusion, 20 CFR § 404.1527(e)(1), the fact that all three physicians[10] who examined plaintiff thought he was disabled is not irrelevant either. As a result, the ALJ cannot possibly state that all examining medical opinions are contrary to preponderant conclusions as there were no other conclusions in the record, period. In light of the fact that both Drs. O'Sullivan and Riger opined that plaintiff

---

[9] The record also contains a DDS evaluation based on a review of medical reports; however, the ALJ did not refer to it in her discussion. It states that plaintiff can lift 20 pounds occasionally, 10 pounds frequently, sit for six hours, and stand and/or walk for two hours. (Tr. at 144.) Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 145.) This RFC was based on minimal findings and the fact that plaintiff did not need much in the way of analgesics, and there was no evidence his headaches were severe enough to limit his activities. (Id. at 148.) The DDS physician opined that the consultative exam was extremely cursory in failing to examine gait or coordination, and that a finding of walking less than two hours and lifting less than ten pounds was not warranted. (Id. at 149.)

[10] Even if Dr. Fritzke is not considered an acceptable medical source as a chiropractor, his opinion does deserve some weight as an "other source." See 20 C.F.R. § 404.1513 (d)(1). In any event, Drs. O'Sullivan and Riger are considered "acceptable medical sources," and they both opined that plaintiff could not work. Id.

needed further testing and evaluation, (tr. at 188, 137), remand is required for this purpose.[11]

CONCLUSION

Accordingly, plaintiff's Motion for Summary Judgment is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment is DENIED in part, and this matter is remanded for further findings in accordance with this order. The Clerk is directed to enter Judgment for plaintiff.

DATED: 03/05/09

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076/Casebeer2374.ss.wpd

---

[11] For this reason, plaintiff's claim that the ALJ failed to pose a proper hypothetical to the vocational expert will not be decided at the present time.

15